UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RONICE LOUIS,                          *
                                       *
        Petitioner,                    *
                                       *
        v.                             *
                                       *      Civil Action No. 1:25-cv-10679-IT
MELIDA CHARLES,                        *
                                       *
        Respondent.                    *
                                       *

FINDINGS OF FACT AND CONCLUSIONS OF LAW

April 29, 2026

TALWANI, D.J.

Pending before the court is Petitioner Ronice Louis's Verified Complaint/Petition [Doc. No. 1] against Respondent Melida Charles pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, which implements the Hague Convention. Mr. Louis seeks the return of the parties' minor child ("S.L.C.") to Chile, asserting that Ms. Charles, with whom S.L.C. currently lives in Southbridge, Massachusetts, wrongfully removed the child in December 2023. Respondent opposes the petition, arguing that S.L.C. was not wrongfully removed and that, even if Petitioner could make that prima facie showing, S.L.C. should not be returned to Chile because: (1) S.L.C. would face grave risk of harm upon return; and (2) the child is well-settled in Massachusetts.

Based on the following, the court finds both that S.L.C. would face grave risk of harm if returned to Chile and that S.L.C. is well-settled in Massachusetts. Accordingly, the Petition is DENIED.

1

### I.      Procedural History

On August 13, 2024, Petitioner filed a formal request under the Hague Convention[1] and, on March 24, 2025, he initiated this action. The court prohibited Respondent from removing S.L.C. from the District of Massachusetts during the pendency of proceedings. After appointing counsel for Respondent, the court granted the parties' joint proposal for fact and expert discovery and scheduled an evidentiary hearing for November 2025. The court subsequently granted the parties joint request to extend dates and reset the evidentiary hearing for January 2026.

Respondent moved to strike the expert report of a mental health provider who had evaluated Petitioner on the basis that, inter alia, the expert was not disclosed as a testifying witness. Petitioner opposed, arguing that the report was admissible even in the absence of cross-examination of the expert and that the court should "assign [the report] appropriate weight in light of the entire record." Pet'r's Opp'n 8 [Doc. No. 69]. The court granted Respondent's motion to strike, finding that the proffered report primarily opined on the negative mental health effects experienced by Petitioner due to his separation from his child, a conclusion irrelevant to the court's inquiry under the Hague Convention. Further, the court found that the report failed to disclose the materials upon which the expert based his opinion and, given that he was not available for cross-examination where Petitioner did not intend to call him as a witness, the report was inadmissible. Fed. R. Evid. 801.

The court held a five-day evidentiary hearing on January 12–16, 2026, with witnesses testifying in person or by video as agreed-to by the parties, and with translators for both Spanish and Haitian-Creole speaking witnesses.

---

[1] See Pet. Ex. H [Doc. No. 1-8]. At the time, Petitioner identified himself as a citizen of Haiti. Id. at 2.

## II.    Findings of Fact

The court received exhibits and testimony from Petitioner, Respondent, family and friends of both parties, Respondent's former domestic violence advocate, and two experts in domestic violence, as detailed below.

On review of the evidence and the Stipulated Facts [Doc. No. 60] filed by the Parties, the court makes the following findings of fact.

### A. *The Parties*

Ms. Charles was born in Haiti in January 1998 and is a Haitian citizen. Mr. Louis was born in May 1990, attended school in Haiti and Chile, and is now a Chilean citizen. The parties met in Port-au-Prince, Haiti, in 2013 (per Mr. Louis) or 2015 (per Ms. Charles) when Ms. Charles was a high school student and Mr. Louis was her teacher and eight years her senior.

Mr. Louis moved to Chile in 2017. Ms. Charles followed him and the parties married in Chile, on November 30, 2017.

### B. *Life Together in Chile*

Mr. Louis and Ms. Charles resided in San Antonio, Chile, from 2017–2023. Mr. Louis and Ms. Charles lived in one room of a home as a couple and shared the cooking and living spaces with Mr. Louis's family and friends. Mr. Louis, fluent in Spanish, studied. Ms. Charles, fluent only in Haitian Creole and not proficient in Spanish, worked cleaning restaurants. Ms. Charles had no other relationships or connections other than Mr. Louis in Chile. When Ms. Charles first moved to Chile, she would speak every day on the phone with her father, Delzilma Charles, who lived in Haiti. At some point, Mr. Louis took Ms. Charles's cellphone and did not allow Ms. Charles that access to her father.

Mr. Louis did not want to have a child while he was in school. He provided Ms. Charles with birth control pills, and she took the medication at his behest. Ms. Charles did not understand the frequency and dosage necessary to ensure the efficacy of the medication and became pregnant with S.L.C. in 2018.

The parties offer consistent reports regarding their respective roles caring for S.L.C. in San Antonio after his birth in 2019. Ms. Charles provided primary care to S.L.C., while Mr. Louis studied or worked. Mr. Louis would make himself available to take S.L.C. to medical appointments, pick him up from school, and communicate with school employees. Mr. Louis took on these responsibilities, in part, because he spoke Spanish and Ms. Charles was not fluent in the language.

The parties offered contrary reports as to the violence in the home after Ms. Charles became pregnant with S.L.C. and following his birth. Ms. Charles testified that Mr. Louis would physically attack her, often in response to disputes around cooking or household chores, and that she was afraid to seek medical care or go to the police due to fear of retaliation and escalation. The court finds Ms. Charles's testimony as to the events set forth below both credible and corroborated by hospital records, photographs, witness testimony, and her prior statements.

Mr. Louis expressed his unhappiness with the pregnancy and after Ms. Charles became pregnant, he physically harmed her for the first time by twisting her arm behind her back. Ms. Charles consulted with a doctor regarding the baby's health but did not report the incident to the police because she did not understand the reporting process and feared potential escalation.

In 2019, when Ms. Charles was caring for S.L.C. (who was then two or three months old) and Mr. Louis's girlfriend's three-year-old child, Mr. Louis attacked Ms. Charles, throwing her on the bed and grabbing her neck. Both children witnessed the attack and cried. Ms. Charles

4

feared for her life and the children's safety. She developed bruising on her neck but did not seek medical treatment or report the attack to the police because she "didn't want things to get worse[.]" Jan. 14, 2026 Hr'g Tr. 15:19. In describing this incident to Dr. Spetter, Ms. Charles explained further that she was holding S.L.C. at the time and had to try not to drop S.L.C.

Ms. Charles described that Mr. Louis would often push or shove S.L.C. either as a baby when S.L.C. was crying or, when he was older, toward Ms. Charles in the middle of a dispute between the parties.

In May 2022, Ms. Charles was attempting to administer medication to three-year-old S.L.C. when the parties began arguing about the money Ms. Charles received from the government and Mr. Louis grabbed and squeezed Ms. Charles's neck and hit her in the face and arm. Mr. Louis also pushed S.L.C. and told S.L.C. to "go to your mother." Jan. 14, 2026 Hr'g Tr. 18:18 (Charles). Ms. Charles removed S.L.C. from the scene and later sought medical treatment for injuries sustained during this incident. Corroborating hospital records describe Ms. Charles presenting with bruises on her face and arm on May 5, 2022. Hr'g Ex. 33. Ms. Charles made a videocall to her father from the hospital after receiving medical care for injuries caused by Mr. Louis and Mr. Charles observed injuries to Ms. Charles's head, face, and stomach.

In February 2023, the parties argued about money Ms. Charles had earned as a cleaner. During the argument, Mr. Louis grabbed and pulled Ms. Charles by her hair/wig, hit her in the chest and stomach, and "slapped [her] so hard that [she] fell down[.]" Jan. 14, 2026 Hr'g Tr. 20:24–21:3 (Charles). Four-year-old S.L.C. cried and approached his mother during the incident. Ms. Charles reported to a friend, Presliner Prestanor, that Mr. Louis continued to hit her while she was holding S.L.C. and that she found it difficult to hold onto the child during the attack and prevent him from falling. Later that day, Ms. Charles reported the attack to the police and a

5

domestic violence advocate, Valentina Serrano Adrovéz, who observed bruises on Ms. Charles's face, arm, and stomach. Ms. Adrovéz photographed Ms. Charles's arm at the police station, documenting the bruising. Hr'g Ex. 53–54. The police and Ms. Adrovéz accompanied Ms. Charles to the hospital. Hospital records dated February 13, 2023, describe "small bruises" on Ms. Charles's arm and her report of "punches to head, right arm, and stomach." Hr'g Ex. 32. Those bruises on Ms. Charles's face, arms, and neck were also observed by Mr. Prestanor, when he first met Ms. Charles in March 2023.

Mr. Louis disputes that he ever harmed Ms. Charles. When asked to describe the parties' relationship, Mr. Louis stated "the relationship was peaceful. We didn't have any issues. . . . Everything was okay, peaceful." Jan. 13, 2026 Hr'g Tr. 15:1–3. When asked if he knew who was responsible for Ms. Charles's injuries resulting in the May 2022 and February 2023 hospital visits, Mr. Louis acknowledged that the parties lived together during the relevant timeframe but denied that she had the bruises while they were living together. Although the couple's housemates in San Antonio were Mr. Louis's family and friends, Mr. Louis called none of them as witnesses. In light of Ms. Charles's credible testimony and the significant evidence corroborating her account set against Mr. Louis's blanket denial, the court is unable to credit Mr. Louis's testimony.

C.  *Separation and Protective Orders*

Following the February 2023 incident, Ms. Charles met with Ms. Adrovéz several times. Ms. Adrovéz concluded, based on her interviews and observations of Ms. Charles, that Ms. Charles had experienced physical, economic, social, and psychological violence and that Mr. Louis had isolated Ms. Charles, rendering her dependent on him and more vulnerable to abuse. With Ms. Adrovez's assistance, in February 2023, Ms. Charles obtained from the Chilean family

court a temporary restraining order, prohibiting Mr. Louis from communicating with both Ms. Charles and S.L.C. Since entry of that temporary restraining order in February 2023, Mr. Louis has had no further interaction with S.L.C.

Pursuant to another protective measure ordered by the court, Ms. Adrovéz and the advocacy organization helped Ms. Charles relocate to Cartagena, Chile, around 20–25 minutes from San Antonio. Ms. Adrovéz testified that relocation "is always the last measure" a court provides to a victim of domestic violence. Jan. 15, 2026 Hr'g Tr. 58:17–18. Ms. Charles stayed in Cartagena for about two weeks, but Mr. Louis continued to "follow [her] because he found that [she] had gone to the police." Jan 14, 2026 Hr'g Tr. at 32:18–22 (Charles).

In March 2023, Ms. Charles moved to Colina, Chile, approximately two hours away from San Antonio. Ms. Charles testified that Mr. Louis sent associates to "watch" her and that, when she would go out or take S.L.C. to daycare, Mr. Louis's associates would follow her. Id. at 34:21–35:4.

Additionally, Mr. Louis sent Ms. Charles several threatening messages while she and S.L.C. lived in Colina. In early March 2023, Mr. Louis texted Ms. Charles: "Anything that happens, you ask for it[.] Forewarned is forearmed[.] You already know the Haitian culture. You know what we can do, you are very bold[.]" Hr'g Ex. 22.[2] Ms. Charles understood the references to "Haitian culture" as entailing threats to "kill [her] through a voodoo priest and also . . . send bandits to [her] parents [in Haiti] to threaten them." Jan 14, 2026 Hr'g Tr. at 37:24–38:2. In mid-March 2023, Mr. Louis texted Ms. Charles: "Now I am going to deal with you. . . . I don't care if I die, but we will both lose." Hr'g Ex. 24.

---

[2] The parties provided certified English translations of the Haitian-Creole text messages.

Also around that time, Mr. Louis sent Ms. Charles a photograph of an adult and child lying together in a coffin. Hr'g Ex. 30. Ms. Charles testified that in addition to the photograph, Mr. Louis had texted her a message that said "he would kill S.L.C. and kill [her]" but Mr. Louis deleted the message before she was able to take a screenshot of it. Jan. 14, 2026 Hr'g Tr. 44:22–25.

In April 2023, the prosecutor's office reaffirmed protective measures, ordering that Ms. Charles receive safety checks by the local police and have access to a priority phone number for the police station. Hr'g Ex. 31.

On July 31, 2023, after Ms. Charles reported that Mr. Louis had continued to violate the no-contact order, a family court in Colina "ordered a precautionary measure prohibiting [Mr. Louis] from approaching [Ms. Charles] and [S.L.C.] within a radius of 200 meters from their private resident, their place of study, or in general any place where they are located or regularly visit." Stip. Facts ¶ 11 [Doc. No. 60]; Hr'g Ex. 61. The court also extended a previously entered order prohibiting Ms. Charles from leaving the country with S.L.C during the pendency of the custody dispute. Hr'g Ex. 61.

### D.  Ms. Charles Travels to Mexico and the Chilean Court Removes the Protective Measures

Ms. Charles left Chile with S.L.C. on December 23, 2023, in violation of the travel prohibition and traveled to Mexico.

In 2024, with Ms. Charles absent, the family court removed the previously ordered protective measures and determined that Mr. Louis did not pose a risk to S.L.C.[3]

---

[3] The court did not admit into evidence the evaluation of Mr. Louis, Proposed Exhibit 12, that preceded the family court's removal of the protective measures where Petitioner did not offer the

*E.  Life in Massachusetts*

Ms. Charles and S.L.C. entered the United States at the Texas border on July 10, 2024. Ms. Charles and S.L.C. first stayed in Connecticut with Ms. Charles's sister and then moved to Brockton, Massachusetts, in August 2024. Ms. Charles and S.L.C. have lived in Southbridge, Massachusetts, since February 2025. They share an apartment with Ms. Charles's friends and S.L.C.'s godparents, the Prestanors, and the Prestanors' three-year-old child. Ms. Charles met the Prestanors while she lived in Colina and the couple assists Ms. Charles care for S.L.C.

Ms. Charles has applied for asylum for both herself and S.L.C. and has a hearing scheduled for Summer 2026. Ms. Charles is authorized to work in the United States. Hr'g Exs. 60, 70. She has previously worked for Amazon and has been meeting with a career counselor. The Prestanors and Ms. Charles's father provide Ms. Charles and S.L.C. with financial assistance when necessary. Since moving to Southbridge, Ms. Charles has been taking English lessons to assist her finding work and so that she can help S.L.C. with his homework.

S.L.C. attends the public elementary school in Southbridge. S.L.C.'s first language is Spanish. S.L.C.'s school provides English as a second language programming, in which S.L.C. has been making progress. Hr'g Ex. 43. He speaks English at school and in the community with friends. S.L.C. has improved in reading and math since first attending school in Southbridge. S.L.C. attends music classes and church in Southbridge weekly.

---

evaluation during his case-in-chief and where the evaluator was not a witness subject to cross-examination during the hearing.

*F. Expert Testimony*

Two experts testified during the evidentiary hearing on behalf of Ms. Charles: Dr. Jeffrey Edelson, a researcher and professor of social work, specializing in domestic violence; and Dr. Dante Spetter, a forensic psychologist who interviewed Ms. Charles and S.L.C.

Both experts opined that return to Chile would pose grave risk of psychological and physical harm to S.L.C. Regarding psychological harm, Dr. Spetter testified that witnessing physical abuse places children at risk for anxiety, depression, post-traumatic stress disorder, substance abuse, and suicide as they get older. Dr. Edelson testified that research shows that children exposed to domestic violence often exhibit developmental difficulties and harms comparable to children who are directly physically abused.

The experts opined that it was likely that S.L.C. would continue to witness Mr. Louis's abuse of either Ms. Charles or another female partner upon return. Additionally, both experts testified that many boys, as they grow older, often intervene in episodes of domestic violence and become injured in the process. Both experts pointed to Mr. Louis's pattern of abusing Ms. Charles while she was pregnant or holding S.L.C. as support for their conclusion that Mr. Louis posed an "extremely high" or "very high" risk of physical harm to S.L.C., even if inadvertent, upon return. Jan. 15, 2026 Hr'g Tr. 98:24–25 (Edelson); Jan. 16, 2026 Hr'g Tr. 31:9 (Spetter). Both experts opined that abuse of the mother while pregnant and non-fatal strangulation are both high risk factors for future violence and even lethality.

Additionally, both experts opined that Mr. Louis's behavior was consistent with a psychological dynamic known as coercive control, in which a perpetrator of abuse uses a variety of tactics to gain and maintain control or power over the victim. This dynamic, they opined, is common in the context of domestic violence and is exemplified by repeated patterns of coercive

10

behavior. A perpetrator's tactics often escalate with respect to risk and danger when a victim attempts or succeeds at separation due to the perpetrator's loss of control. Dr. Spetter testified that "sometimes in cases of extreme coercive control, a parent will start abusing a child . . . in order to continue to exert control and pain on their former domestic partner . . . either as a way to get that person to come back, which sometimes they'll do to try to protect their child, or just as a way to cause them ongoing harm." Jan. 16, 2026 Hr'g Tr. 33:19–34:2.

Both experts opined that return to Chile could pose lethal-level risk to S.L.C. because of several factors consistent with research on coercive control. Pointing to the same facts the court has found credible—namely, that Mr. Louis failed to comply with the no-contact order when Ms. Charles first moved out of the marital home and to Cartagena, when she relocated again to Colina, Mr. Louis escalated and began to make threats of violence and death directed at both Ms. Charles and S.L.C., as well as threats of suicide, and Petitioner sent associates to follow Ms. Charles and monitor her movements—the experts opined that this escalation upon separation, in addition to Petitioner's history of violence, particularly non-fatal strangulation, posed significant lethal risk to S.L.C. upon return to Chile.

### III.    Conclusions of Law

#### A.  Legal Standard

The Hague Convention was adopted by the signatory nations—including the United States and Chile—"[t]o address 'the problem of international child abductions during domestic disputes[.]'" Lozano v. Montoya Alvarez, 572 U.S. 1, 4 (2014) (quoting Abbott v. Abbott, 560 U.S. 1, 8 (2010)); see Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 305 (1st Cir. 2019) (noting the Convention "aims to deter parents from abducting their children to a country whose courts might side with them in a custody battle"); Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015)

(explaining that "[t]he Hague Convention on the Civil Aspects of International Child Abduction is . . . intended to combat international child abductions during domestic disputes."). The Convention does not empower the adjudicating court to make any determinations regarding child custody. See 22 U.S.C. § 9001(b)(4). The court is tasked solely with determining whether that custody decision should be made here in the United States or in the child's country of habitual residence. See id. "The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest." Mendez, 778 F.3d at 343 (citations omitted).

"A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence." Id. (citing 22 U.S.C. § 9003(e)(1)(A) and Sánchez-Londoño v. Gonzalez, 752 F.3d 533, 539 (1st Cir. 2014)). "The petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." Id. (citing Hague Convention, art. 3 and Sánchez-Londoño, 752 F.3d at 539–40). "If these three elements are met, and the petitioner has commenced judicial or administrative proceedings within one year of the date of wrongful removal, the Convention commands that the court reviewing the petition 'shall order the return of the child forthwith.'" Id. (quoting Hague Convention, art. 12). Accordingly, ICARA includes the Congressional finding that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

"The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings. . . . Upon the child's return, the custody adjudication will proceed in that

forum." Monasky v. Taglieri, 589 U.S. 68, 72 (2020) (citing Linda Silberman, Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence, 38 U.C.D. L. REV. 1049, 1054 (2005)). "[I]t is the job of the courts of [the child's habitual residence], not the district court, to 'make the appropriate custodial and family law determinations.'" da Silva v. de Aredes, 953 F.3d 67, 77 (1st Cir. 2020) (quoting Mauvais v. Herisse, 772 F.3d 6, 21 (1st Cir. 2014)); see also Vieira v. De Souza, 22 F.4th 304, 308 (1st Cir. 2022) ("Notably, an order of return pursuant to the Hague Convention is not a final determination of custody rights. It simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence.") (quotation omitted)).

    B. *Prima Facie Case*

Petitioner must establish by a preponderance of the evidence that Respondent "wrongfully removed or retained [S.L.C.] within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). To establish that a retention is "wrongful" under the Convention, Petitioner must show that: (1) Chile is S.L.C.'s country of habitual residence; (2) Petitioner had custody rights immediately prior to S.L.C.'s removal; and (3) Petitioner exercised those rights. Mendez, 778 F.3d at 343 (citing Hague Convention, art. 3).

Here, the parties do not dispute that Chile is S.L.C.'s habitual residence but disagree on the two additional elements. Petitioner argues that he had custody rights because Chilean law provides custody to both parents in the absence of an official custody agreement, see Pet.'s Trial Br. 4–5 [Doc. No. 66], and because Chilean law requires a parent to gain the other parent's consent before taking the child abroad. See Minors Law 16,618, Art. 49.

The parties were in the middle of a custody dispute when Ms. Charles removed S.L.C. from Chile, in violation of a court ordered travel prohibition. Given the incomplete nature of the

custody proceedings in Chile and Chilean law's provision of a <u>ne exeat</u> right, the court finds that Mr. Louis had custody rights over S.L.C. at the time of the removal. <u>See</u> <u>Abbott</u>, 560 U.S. at 15 ("The consent provision in Minors Law 16,618 confers upon the father the joint right to determine his child's country of residence. This is a right of custody under the Convention.").

Petitioner also asserts that he was exercising those rights at the time that Ms. Charles left Chile. Ms. Charles disagrees, citing the February 2023 no contact order that prevented Mr. Louis from interacting with S.L.C. from that date forward. <u>See</u> Resp.'s Trial Br. 26 [Doc. No. 67]. Although Ms. Charles is correct that Mr. Louis was not exercising custodial rights starting in February 2023 because of the temporary protective order, neither party has provided the court with legal authority as to how to weigh that temporary order barring contact in determining a <u>prima facie</u> case under the Hague Convention. Ultimately, the court need not resolve that legal issue, given the applicability of Ms. Charles's defenses.

### C.  Affirmative Defenses

The Hague Convention outlines specified defenses that can rebut a <u>prima facie</u> case for removal. Ms. Charles asserts two of these "narrow exceptions": (1) grave risk to the child; and (2) delay or whether the child is now well-settled in the new environment. Hague Convention, art. 12, 13(b); 22 U.S.C. § 9003(e)(2)(A). The court considers each in turn.

#### 1.  Grave Risk

The grave risk defense requires Respondent to show, by clear and convincing evidence, "there is a grave risk that . . . return would expose the child to physical or psychological harm[.]" <u>Danaipour v. McLarey</u>, 286 F.3d 1, 13 (1st Cir. 2002) (quoting Hague Convention, art. 13(b), T.I.A.S. No. 11,670, at 8). The court must have "an abiding conviction that the truth of [Respondent's] factual contentions are 'highly probable.'" <u>Colorado v. New Mexico</u>, 467 U.S.

14

310, 316 (1984) (quoting Charles McCormick, Laws of Evidence § 320, at 679 (1954)).

Respondent "must prove subsidiary facts by a preponderance of the evidence." da Silva, 953 F.3d

at 73 (citing Yaman v. Yaman, 730 F.3d 1, 11 (1st Cir. 2013)). Further, "the harm must be

something greater than would normally be expected on taking a child away from one parent and

passing [the child] to another." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) (quotation

omitted). This defense is not "a vehicle to litigate (or relitigate) the child's best interests."

Danaipour, 286 F.3d at 14 (quoting Hague International Child Abduction Convention: Text and

Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)).

In cases involving domestic violence, abuse directed at the respondent alone is

insufficient to establish grave risk of harm to the child. See Whallon v. Lynn, 230 F.3d 450, 460

(1st Cir. 2000) (concluding verbal abuse of child's mother and sibling and shoving of child's

mother insufficient to establish grave risk of harm to child). However, one parent's abuse of

another is relevant where the abuse affects the child. For example, in Walsh, the First Circuit

found that the respondent established grave risk of harm to her children based on the petitioner's

abuse of the respondent. See 221 F.3d at 218–20. The court explained that the evidence of the

father's abuse of the mother, witnessed by the children, and violent interactions with others, in

conjunction with both "credible social science" establishing a link between spousal and child

abuse and the recognition of state and federal law that "children are at increased risk of physical

and psychological injury themselves when they are in contact with a spousal abuser[,]" all

amounted to clear and convincing evidence that the children's return would pose grave risk of

harm. Id. at 219–20.

The First Circuit has distinguished Walsh's holding in circumstances involving domestic

violence but insufficient evidence connecting spousal abuse to its effects on the child. See Vieira,

22 F.4th 304 at 310 (affirming no grave risk finding of district court where respondent-mother fled petitioner-father because of domestic verbal abuse and child remained in father's care for two years with no allegations of harm before mother removed child to United States); da Silva, 953 F.3d at 74 (no grave risk where the respondent-mother's testimony regarding abuse by petitioner-father was "often conflicting or inconsistent" and evidence of father's abuse of child was attenuated and inconclusive). This is not such a case.

Here, Respondent has demonstrated clear and convincing evidence that return to Chile would place S.L.C. at grave risk of psychological or physical harm. Unlike the respondent in da Silva, 953 F.3d at 74, Ms. Charles's testimony was consistent and credible. And, contrary to the circumstances in Vieira, 22 F.4th at 310, Mr. Louis's abuse of Ms. Charles endangered S.L.C.'s safety, as detailed further below. Based on the testimony of the parties, fact witnesses, and experts, the court finds that Mr. Louis's conduct over the course of his relationship with Ms. Charles demonstrates a pattern of escalating risk and danger to S.L.C., and that the measures attempted by the Chilean courts were unsuccessful in prohibiting Mr. Louis's contact and threats.

Importantly, Ms. Charles testified credibly that S.L.C. observed Mr. Louis's physical abuse of her. In all attacks described by Ms. Charles, S.L.C. was present in the room and cried while witnessing the abuse. Ms. Charles's statements are bolstered by her uncontested description of the parties' living situation. Given that Mr. Louis, Ms. Charles, and S.L.C. all shared one room in the home they shared, S.L.C. would have necessarily witnessed any abuse that occurred in that space. See, e.g., Baran v. Beaty, 526 F.3d 1340, 1346 (11th Cir. 2008) (despite the absence of evidence showing that petitioner-father abused child in the past, father's alcohol abuse, violent temper, abuse of respondent-mother in child's presence, and threats to hurt child justified a finding of a grave risk of harm). Additionally, consistent with her testimony

16

during the evidentiary hearing, Ms. Charles reported to a friend and a psychologist that Mr. Louis would attack her while she was holding S.L.C. See Fed. R. Evid. 801(d)(1)(B). Ms. Charles's credible reports of Mr. Louis's abuse in the presence of S.L.C., in conjunction with her testimony that his abuse commenced when she first became pregnant, demonstrate Mr. Louis's disregard for S.L.C.'s safety.

Finally, when Ms. Charles separated from Mr. Louis and moved, first to Cartegena, and then to Colina, Mr. Louis sent Ms. Charles death threats, directed at both her and S.L.C. Hr'g Exs. 23–24, 30; see, e.g., Acosta v. Acosta, 725 F.3d 868, 875–76 (8th Cir. 2013) (petitioner-father's inability to manage his anger with others, abuse of respondent-mother in children's presence, and expression of threats of suicide and of death to children supported a high probability that, upon return, father would "become violent and harm the children.").

Mr. Louis asserts that he "ha[s] not found any entities, any institution that blame me– blame me for that type of stuff." Jan. 13, 2026 Hr'g Tr. 33:19–20. But no entity considered the testimony of both sides prior to this hearing on Mr. Louis's Petition [Doc. No. 1].

Ultimately, the court finds that Ms. Charles has demonstrated by clear and convincing evidence that she was physically abused by Mr. Louis, while holding or at least in the presence of S.L.C., and that Mr. Louis failed to comply with measures put into place by the Chilean courts to protect her and the child. Based on these findings, as well as Drs. Edelson and Spetter's testimony regarding the likelihood of retribution or escalation upon return and the risk factors for lethality, the court concludes that return to Chile would pose a grave risk of both psychological and physical harm to S.L.C. See Danaipour, 386 F.3d at 303 (explaining that some harms are "beyond the power of any court to prevent or remedy if the child[] w[as] returned").

17

### 2. Well-Settled

Separately, under the "well-settled defense," a child should not be returned if the petition was filed more than one year after the alleged wrongful retention and the child is "now settled in [the child's] new environment." Hague Convention, art. 12; see Lozano, 572 U.S. at 5 (based on Article 12, "at least in some cases, failure to file a petition for return within one year renders the return remedy unavailable."). Here, Petitioner did not file his Petition [Doc. No. 1] for fifteen months, allowing the court to consider this defense.

In determining whether a child is now sufficiently well-settled to rebut a petitioner's prima facie case, the court considers the totality of the circumstances. See da Costa v. de Lima, 94 F.4th 174, 180 (1st Cir. 2024) (citing da Silva, 953 F.3d at 75). The "court may consider any relevant fact," including:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

Id. (quoting da Silva, 953 F.3d at 75 and In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009)).

The inquiry is holistic rather than an exhaustive or mandatory consideration of each of the seven factors. See Rodrigues v. Silveira, 141 F.4th 355, 363–64 (1st Cir. 2025). "In other words, the district court may use the factors to develop the record, and after doing so, it must decide whether the constellation of facts–viewed in the aggregate–paints the picture of a child who is settled in the United States." Id. at 364.

After considering the "constellation of facts" in the record, the court concludes that S.L.C. is "well-settled" in Southbridge, Massachusetts. See id. ("A now settled child, however, need not have a perfect or flawless life; we ask only if the constellation of facts shows a child

18

with significant connections demonstrating a secure, stable, and permanent life in his or her new environment." (quotation omitted)). S.L.C. is young, six-years-old, and was observed by Dr. Spetter as demonstrating a secure attachment to Ms. Charles.

At the time the Petition [Doc. No. 1] was filed, S.L.C. had lived apart from Mr. Louis for two years, outside of Chile for fifteen months, in Massachusetts for seven months, and in his current home for one month. By the time of the evidentiary hearing, S.L.C. had lived in Southbridge for just under a year. Although this is not a lengthy timeframe, such a period is "a significant amount of time in the life of a school-age child." Rodrigues, 141 F.4th at 364. S.L.C. consistently attends elementary school and is well-supported by teachers and staff in his education generally and specifically in his development of English language learning.

S.L.C. lives with three adults, his mother and godparents, who contribute to his care, and his godparents' child, with whom he is playmates. S.L.C. attends weekly music classes and church. Ms. Charles, while not currently working, is authorized to work, actively looking for work, and is taking English lessons to improve her work prospects and to assist S.L.C. with his own learning. Additionally, Ms. Charles is financially supported by both her housemates and family in Haiti. His living environment is stable, consistent, and supported by both Ms. Charles and an extended network of family and friends. S.L.C. presented to Dr. Spetter upon evaluation as a "healthy, typically developing[, and] delightful little boy." Jan. 16, 2026 Hr'g Tr. 19:5–15. Dr. Spetter testified further that S.L.C. appeared healthy and was "developing nicely" with respect to his English language learning. Id. at 19:16–20, 21:6–10. The court finds that Respondent has demonstrated, by a preponderance of the evidence, S.L.C. is connected to and supported by his community and network and is a "well-settled" child. See da Costa, 94 F.4th at 181–82.

## IV.    Conclusion

Given the court's determination that S.L.C. would face a grave risk of harm if returned and that he is well-settled in Massachusetts, Respondent has established both affirmative defenses. Accordingly, the court will not order S.L.C. returned to Chile and the Verified Complaint/Petition [Doc. No. 1] is DENIED.

IT IS SO ORDERED.

April 29, 2026                              /s/ Indira Talwani
                                           United States District Judge

20